**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIM. ACTION NO. 3:24-00164-01** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **MAURICE MITCHELL (01)** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

# REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 24] filed by Defendant Maurice Mitchell. For reasons stated below, it is recommended that the motion be DENIED.

## Background

At approximately 10:00 p.m., on the night of January 8, 2023, Ouachita Parish Sheriff Deputies Sams, Hurd, and Lowder responded to a call regarding a burglary in progress at the Arrowhead Mini Storage in Bawcomville, Louisiana. Within minutes, the deputies arrived on-scene and observed two individuals, later identified as Carmon Pehl ("Pehl") and Maurice Mitchell ("Mitchell"), exiting between two rows of storage units. Pehl was walking beside Mitchell, who was riding a bicycle. Deputy Lowder approached Pehl, who acceded to Lowery's request to search her, which resulted in her arrest on narcotics charges.

Meanwhile, upon observing the deputies, Mitchell disregarded their commands to stop, and, instead, attempted to ride away on the bicycle. However, he promptly rode into a culvert, causing him to fall over. Mitchell quickly stood up, discarded his jacket, and proceeded to flee on foot, leaving his bicycle and a brown satchel behind. After a brief 50-yard chase, the deputies apprehended Mitchell and arrested him for "resisting." During the arrest process, the

deputies searched Mitchell,[1] and uncovered various narcotics.[2] A subsequent search of Mitchell's jacket revealed a glass pipe with suspected meth residue. Deputies also searched the brown satchel that was attached to Mitchell's abandoned bicycle, wherein they discovered a handgun and additional narcotics.[3] According to Mitchell, he was charged in the Fourth Judicial District Court for the Parish of Ouachita, State of Louisiana, with a panoply of narcotics violations; possession of a firearm by a felon, Louisiana Revised Statute § 14:95.1; and resisting an officer, Louisiana Revised Statute § 14:08. (Def. M/Suppress, pg. 2 [doc. # 24]).

Over one year later, on August 7, 2024, a federal grand jury returned a one-count Indictment against Mitchell, charging him with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), as a result of the January 8, 2023 encounter. The Indictment also included forfeiture allegations. Mitchell was arraigned on August 6, 2024, and entered a plea of not guilty.

On October 11, 2024, Mitchell filed the instant motion to suppress all evidence and statements obtained as a result of his January 8, 2023 arrest, on the grounds that they were obtained in violation of his rights under the Fourth and Fifth Amendments. The Government filed its response to the motion on October 25, 2024. (Gov.'t Response [doc. # 26]).

---

[1] Gov.'t Post-Hearing Memo., pg. 9 [doc. # 37].

[2] The drugs purportedly consisted of five suspected Lorazepam tablets and 3.5 grams of suspected marijuana. However, no testimony or evidence was presented at the suppression hearing regarding the drugs found on Mitchell's person. Rather, Mitchell disclosed this information in his brief. (Def. M/Suppress, pg. 2 [doc. # 24]).

[3] No testimony or evidence was presented at the suppression hearing regarding the specific drugs found in the satchel. In his brief, however, Mitchell stated that deputies found two suspected ecstasy pills, three grams of suspected methamphetamine, and 1.5 grams of suspected marijuana. (Def. M/Suppress, pg. 2 [doc. # 24]).

The Court held a November 4, 2024 hearing on the motion, where it heard testimony from two government witnesses, Ouachita Parish Sheriff Deputies Daniel Sams and John Hurd. The Court also received two defense exhibits into evidence, a Google aerial photo of the arrest scene and a Google map of the area. *See* Def. Exhs. 1-2 [doc. # 30].

On November 15, 2024, the transcript of the one and one-quarter hour-long hearing was filed in the record. (Transcript [doc. # 33]) (hereinafter abbreviated to, "Tr"). Mitchell and the Government filed post-hearing memoranda on December 9 and 30, 2024, respectively. *See* doc. #s 34 & 37. Accordingly, the matter is ripe.

**Law and Analysis**

At the conclusion of the suppression hearing, counsel for the Government stated that it would not seek to rely on the drug evidence or statements by Mitchell, but sought only to admit into evidence the firearm from the brown satchel. (Tr. 50). Therefore, the Court's analysis will be limited to the contents of the satchel.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. CONST. AMEND. IV.[4] "The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution." *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006).

Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a criminal proceeding against the victim of the illegal search or seizure."

[4] The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979) (citation omitted).

*United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct. By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)). However, the exclusionary rule is not without limits, and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.*

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted). However, when the government conducts a search without a warrant, then the government bears the burden of proving, by a preponderance of the evidence, that the search was constitutional. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

"[A] criminal defendant seeking suppression must show that 'his *own* Fourth Amendment rights [were] infringed by the search [or] seizure which he seeks to challenge.'" *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020) (quoting *Byrd v. United States*, 584 U.S. 395, 403 (2018)). This concept is described as one of Fourth Amendment standing, which the Supreme Court has explained "is not distinct from the merits and 'is more properly subsumed under substantive Fourth Amendment doctrine.'" *Byrd,* 584 U.S. at 410 (quoting *Rakas v. Illinois*, 439 U.S. 128, 193 (1978)).

A defendant can establish his personalized interest in the search in one of two ways: 1) he may object to the physical intrusion of a constitutionally protected area in which he has a property interest; and 2) he may object to government action that violates a reasonable expectation of privacy in the place searched. *Beaudion,* 979 F.3d at 1097 (citations omitted). "Either way, the Fourth Amendment standing inquiry is both defendant- and place-specific: it requires that a *particular* defendant (the suppression movant) have a property or privacy interest in a *particular* place (the area searched). *Id.* (citation omitted).

Furthermore, "a person has no standing to challenge a search or seizure of property that was voluntarily abandoned" or conveyed to another. *United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013) (quoting *United States v. Alvarez*, 6 F.3d 287, 289 (5th Cir. 1993) (holding defendant lacked standing to object to a search of a garment bag after denying ownership and voluntarily abandoning the bag in a motel room)). A defendant who abandons or disclaims ownership of property prior to the search does not have standing to challenge a search subsequent to his abandonment or disclaimer of that property. *Iraheta*, 764 F.3d at 461; *see, e.g., United States v. Johnson*, 2008 WL 3876550, at *2-3 (5th Cir. 2008) (unpubl.) (holding that a defendant had no standing when he had abandoned a fanny pack by leaving it on another's property without permission prior to the search); *United States v. Roman*, 849 F.2d 920, 922 (5th Cir. 1988) (holding that a defendant had no standing because the defendant had abandoned his luggage prior to the search at an airport).

"Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered." *United States v. Colbert*, 474 F.2d 174, 176

(5th Cir. 1973) (internal citations omitted). Moreover, "[p]olice pursuit or the existence of a police investigation does not of itself render abandonment involuntary." *Id*. (citation omitted). Determining whether abandonment has occurred turns on "whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question [such] that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Colbert*, 474 at 176.

In addition, "[t]he Fourth Amendment's protections apply to seizures of the person, which occur when a law enforcement officer restrains a person's liberty by means of either physical force or a show of authority." *United States v. Ferguson*, 816 Fed. App'x. 991, 992 (5th Cir. 2020) (citing *California v. Hodari D.*, 499 U.S. 621, 624-25 (1991). Therefore, the Fourth Amendment is not implicated and does not bar admission of contraband that is abandoned by a fleeing suspect *before* the police catch and physically seize him. *Hodari D.*, 499 U.S. at 629.

Here, it is uncontroverted that Mitchell abandoned his bicycle, together with the attached brown satchel and its contents, before Deputy Sams was able to catch and physically seize him. (Tr. 9, 23-24, 34, 38-39). Furthermore, although Mitchell later admitted to deputies his ownership of the items in his jacket, he conspicuously refused to speak up or answer any questions about the satchel. (Tr. 26-28). In other words, when offered the opportunity to reassert his ownership in the previously abandoned brown satchel and its contents, Mitchell remained mum.

Upon consideration, the Court finds that Mitchell unequivocally evidenced his intent to abandon and relinquish any interest he had in the brown satchel and its contents prior to his

seizure. In so doing, he forfeited any Fourth Amendment reasonable expectation of privacy with regard to the brown satchel and its contents at the time of the post-seizure search. *Colbert*, 474 F.2d at 176.

As stated above, the Supreme Court held in *Hodari D.* that contraband abandoned by a fleeing suspect before he is seized is not subject to Fourth Amendment protection, even when the police lack reasonable suspicion to stop the suspect. *Hodari D.*, 499 U.S. at 629 and n.1.[5] However, some Fifth Circuit cases continue to require that, to be effective, the abandonment must have been "voluntary and not influenced by improper police conduct." *See United States v. Alvarez*, 6 F.3d 287, 289 (5th Cir. 1993); *United States v. Williams*, 79 Fed. App'x. 677, 682 (5th Cir. 2003). Of course, the "legal presence of the police for investigatory purposes or pursuit does not render an abandonment involuntary." *United States v. Quiroz-Hernandez*, 48 F.3d 858, 864 (5th Cir. 1995), *as modified on reh'g* (May 8, 1995) (citation omitted).

In any event, once Mitchell fled, in the face of entreaties from Deputies Sams and Hurd urging him to halt, it is manifest that the deputies had reasonable suspicion to detain him. In *Terry v. Ohio*, the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Indeed,

> [t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of

---

[5] In *Hodari D.*, the Court relied upon the State's concession that the officer did not have reasonable suspicion to stop the defendant. *Id.*

the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 145–46 (1972).

Consequently, "[u]nder *Terry,* if a law enforcement officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime, the officer may briefly detain—that is, 'seize'—the person to investigate." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (citation omitted). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *United States v. Castillo*, 804 F.3d 361, 364 (5th Cir. 2015) (citation omitted). Reasonable suspicion depends "upon both the content of the information possessed by police and its degree of reliability." *United States v. Wright*, 57 F.4th 524, 534 (5th Cir. 2023) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Relevant considerations "may include a description of a suspect, a suspect's location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *United States v. Alvarez*, 40 F.4th 339, 346 (5th Cir. 2022) (citations omitted).

"In determining whether the officer's suspicion, as based on specific and articulable facts, was reasonable, the totality of the circumstances must be considered." *Hill*, 752 F.3d at 1033. (citation omitted). Moreover, "[t]he government has the burden of proving the specific and articulable facts that support the reasonableness of the suspicion. *Id*. (citing *United States v. Jaquez,* 421 F.3d 338, 341 (5th Cir. 2005)).

As relevant here, in appropriate cases, an informant's tip may provide reasonable

suspicion. *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007). Pertinent factors to be considered when deciding whether a tip provides a sufficient basis for a stop include:

> (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity or has instead gone stale.

*United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010). Needless to say, "[w]hether an officer has reasonable suspicion must be based upon the facts known to the officer at the time." *Id*. (citation omitted).

In this case, Deputies Sams, Hurd, and Lowery proceeded to Arrowhead Mini Storage in response to a possible burglary in progress report made to the Ouachita Parish Sheriff's office by Megan Maser ("Maser"). (Tr. 4-5, 14-17). The responding deputies were advised by dispatch that two subjects were at the mini storage and that the complainant believed that she could hear storage units being opened and locks potentially being broken. *Id*. Maser apparently utilized the regular telephone number for the Sheriff's office, rather than calling 911 emergency services number. (Tr. 14).[6]

The responding deputies were informed that the complainant might have been at the Tall Pines Trailer Park, which is across the street from the Arrowhead Mini Storage. (Tr. 27). In addition, there was another section of the Arrowhead Mini Storage that was on the east side of Washington Street, next to a trailer park. (Tr. 10; Def. Exhs. 1-2). As it turns out, the deputies did not know at which of the two Arrowhead storage facilities the alleged burglary was

---

[6] Ultimately, the deputies never made contact with Maser. (Tr. 16, 27). When they later compiled their incident report, deputies searched the drivers' license database and discovered that Maser resided more than one-half mile away at 420 Walters Street. (Tr. 15, 26-27).

occurring. *Id*. Further, the deputies never discovered any evidence of a burglary. (Tr. 22, 27-28).

Nonetheless, Deputies Sams, Hurd, and Lowery arrived at the Arrowhead Mini Storage less than two minutes after they received the call, where they promptly saw two individuals, one of which was Mitchell, in between two rows of storage units. (Tr. 5-7). Deputy Sams was wearing his patrol uniform, and the deputies arrived in marked police units. (Tr. 4). Deputies Sams and Hurd exited the patrol unit and commanded Mitchell to "Stop; sheriff's office." (Tr. 7). Although Mitchell turned and looked at the deputies, he then resumed pedaling away on his bicycle. (Tr. 20-21). After Mitchell fell into the culvert, he discarded his jacket, his bicycle and the attached satchel, and fled on foot. (Tr. 22).

The deputies considered this part of the parish to be a high-crime area. (Tr. 5, 13, 29, 32). There had been several, or even numerous, burglaries in the weeks and months preceding this incident. (Tr. 5, 32).[7] The area was very dark and it was between 10:00 and 11:00 at night. (Tr. 4-5). Furthermore, an attempted burglary is a high-priority call. (Tr. 5). The deputies wanted to make contact with both Pehl and Mitchell because it was a high-crime area, coupled with the call that they had received of a burglary in progress. (Tr. 7). Once Mitchell fled, the deputies intended to arrest him for "resisting." (Tr. 33).

Applying the factors in *Gomez*, the fact that Maser disclosed her name and location enhances the credibility of her complaint. Further, while Maser apparently did not provide descriptions of the alleged burglars, she disclosed the name of the storage unit where the

---

[7] Although Deputy Hurd could not provide precise numbers of calls his office received to that area of the parish, he testified that it was quite common. (Tr. 35-36).

purported crime was being committed. The deputies arrived on-scene within two minutes of receipt of the report of a high priority, in-progress burglary. Upon arrival, they were intent on trying to verify the information from the tip, but before they could do so, Mitchell fled.

The Court need not resolve whether the tip alone provided the deputies with reasonable suspicion to detain Mitchell because Mitchell's unprovoked flight upon observing police in a high crime area activity sufficed to provide the deputies with reasonable suspicion. *Williams*, 79 Fed. App'x. at 681 (citing *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000)); *United States v. Darrell*, 945 F.3d 929, 938 (5th Cir. 2019) (defendant's behavior is a prototypical case of suspicious activity: flight from police in a high-crime area).[8] While Mitchell argues that the government did not provide "proof" that the subject incident occurred in a high crime area, the deputies' own testimony was credible, persuasive, and uncontroverted.[9] Finally, the fact that Mitchell was able to cover approximately 50 yards before Deputy Sams managed to catch up to him in his police unit, *see* Tr. 23, further confirms that Mitchell, at minimum, was proceeding with haste away from the deputies.

Because the deputies had reasonable suspicion to pursue Mitchell for the purpose of conducting a *Terry* stop,[10] the Court finds that Mitchell's abandonment of the brown satchel and

---

[8] Even if the deputies inadvertently went to the wrong portion of the storage unit in response to the burglary tip, their investigation of Pehl and Mitchell as persons of interest was reasonable when they encountered them walking/riding together between buildings of a storage facility, mere minutes after the call was received. *See Ferguson*, 816 Fed. App'x at 993 (officer's reasonable, but mistaken identification of defendant as a wanted fugitive provided reasonable suspicion for a *Terry* stop).

[9]The Google aerial photograph of the area submitted by Mitchell depicts a landscape of trailer parks and storage units consistent with a less-than-affluent area, which may, unfortunately, be reasonably prone to elevated levels of crime. *See* Def. Exh. 1.

[10] Albeit, after Mitchell fled, the deputies subjectively intended to arrest him for "resisting."

its contents, *before he was seized*, was voluntary and not the product of improper police conduct. *Williams*, 79 Fed. App'x at 682. Accordingly, Mitchell does not have standing under the Fourth Amendment to challenge the seizure of the brown satchel and the firearm concealed therein.[11]

**Conclusion**

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 24] filed by Defendant Maurice Mitchell be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

---

[11] In light of the Government's concession that it only seeks to admit the firearm and not any drug evidence or statements, the Court necessarily makes no finding regarding the admissibility of the contraband found on Mitchell's person, the paraphernalia found in his jacket, or his statement claiming ownership of the jacket.

In Chambers, at Monroe, Louisiana, on this 13th day of January, 2025.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE